# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

SONS OF CONFEDERATE VETERANS,
FLORIDA DIVISION, INC., JOHN W.
ADAMS,

               **Plaintiffs,**

-vs-                                    Case No.  6:09-cv-134-Orl-28KRS

JEFFREY H. ATWATER, RAY SANSOM,
ANDY GARDINER, RICHARD
GLORIOSO,  MICHAEL DAVIS,
ELECTRA THEODORIDES-BUSTLE,

               **Defendants.**

_____

## ORDER

    The Sons of Confederate Veterans, Florida Division ("SCV") and its vice president, John W.

Adams ("Adams") (collectively "Plaintiffs"), challenge the constitutionality of statutes establishing

Florida's specialty license plate program.  This challenge arises as a result of the Florida Legislature's

failure to approve issuance of SCV's proposed "Confederate Heritage" specialty plate featuring

depictions of five Confederate flags and two coat buttons worn by Confederate soldiers from Florida.[1]

Plaintiffs contend that Florida's specialty license plate program constitutes a public forum for private

speech. Plaintiffs further argue that the Florida Statutes grant unfettered discretion to the Florida

Legislature to limit speech in violation of the rights of SCV's members to free speech and equal

protection as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

_____

[1]Defendant Electra Theodorides-Bustle has filed a Dispositive Motion to Dismiss, Dispositive
Motion for Judgment on the Pleadings, and Dispositive Motion for Summary Judgment (Doc. 28).
This order addresses those motions and Plaintiff's response thereto (Doc.  29).

I agree.  Florida's specialty license plate program implicates private speech rights, and section 320.08053, Florida Statutes (2009), is unconstitutional to the extent it grants the Florida Legislature discretion to decline approval of an application for a specialty license plate based on the sponsor's viewpoint.

## Background[2]

In 1995, the Florida Legislature ("Legislature") established a scheme for the creation of "specialty license plates."[3]  An organization wishing to establish a specialty licence plate under this statutory scheme must submit to the Department of Highway Safety and Motor Vehicles ("the Department"): (1) a request for the specialty plate being sought, describing the proposed license plate in specific terms, including a sample plate; (2) a scientific survey indicating that at least 30,000 motor vehicle owners intend to purchase the proposed license plate; (3) an application fee, not to exceed $60,000, to defray the costs incurred by the Department in the review of the application and development of the specialty license plate; and (4) a marketing strategy and financial analysis

---

[2] The parties stipulated to the factual statements contained in the Background Section.  (*See* Doc. 35-1).

[3] The statutory provisions relevant to the present action include sections 320.08053, 320.08056, and 320.08058, Florida Statutes.  While section 320.08053 was amended effective September 1, 2010, the amended version of the statute does not apply to organizations that submitted a letter of intent to the Department prior to May 2, 2008 and a valid survey, marketing strategy, and application prior to October 1, 2008.  Ch. 2010-223, §§ 21-23, 49 Laws of Fla.  SCV submitted the required documentation prior to May 2, 2008.  (Doc. 35-1 ¶ 11).  As a result, the version of section 320.08053 effective September 1, 2010, does not apply to SCV's application for the "Confederate Heritage" specialty license plate.  Rather, section 320.08053, Florida Statutes (2009), is applicable because it contains the language that was in effect in 2008 when SCV submitted its application.  For ease of reference, section 320.08053, Florida Statutes (2009), will be discussed in the remainder of the Order without citation to year, i.e., "section 320.08053" or "§ 320.08053, Fla. Stat."

outlining the anticipated revenues and the planned expenditures of the revenues generated by the specialty plate.[4] § 320.08053(1), Fla. Stat.  If these requirements are satisfied, the Department submits the plan to the Legislature, and a specialty plate may then be created through passage of legislation amending sections 320.08056 and 320.08058.   However, the statutory scheme is not specific as to how such enactment is to occur or what criteria–if any–are to be applied in the process.   In commenting on the enactment process, the Eleventh Circuit has noted that "[i]f the sponsoring

---

[4] Section 320.08053 provides:

(1) An organization that seeks authorization to establish a new specialty license plate for which an annual use fee is to be charged must submit to the department:
(a) A request for the particular specialty license plate being sought, describing the proposed specialty license plate in specific terms, including a sample plate that conforms to the specifications set by the department and this chapter, and that is in substantially final form.
(b) The results of a scientific sample survey of Florida motor vehicle owners that indicates at least 30,000 motor vehicle owners intend to purchase the proposed specialty license plate at the increased cost. . . .
(c) An application fee, not to exceed $60,000, to defray the department's cost for reviewing the application and developing the specialty license plate, if authorized. . . .
(d) A marketing strategy outlining short-term and long-term marketing plans for the requested specialty license plate and a financial analysis outlining the anticipated revenues and the planned expenditures of the revenues to be derived from the sale of the requested specialty license plates.

The information required under this subsection must be submitted to the department at least 90 days before the convening of the next regular session of the Legislature.

(2) If the specialty license plate requested by the organization is approved by law, the organization must submit the proposed art design for the specialty license plate to the department, in a medium prescribed by the department, as soon as practicable, but no later than 60 days after the act approving the specialty license plate becomes a law. If the specialty license plate requested by the organization is not approved by the Legislature, the application fee shall be refunded to the requesting organization.

-3-

organization satisfies the[] requirements [of section 320.08053(1)]," the Legislature "has unfettered discretion to enact a law authorizing the specialty plate, or to reject the plan *in toto*." *Women's Emergency Network v. Bush*, 323 F.3d 937, 941 (11th Cir. 2005) (citations omitted) (emphasis in original).

SCV is a Florida corporation, (Doc. 35-1 ¶ 1), and its membership is comprised of descendants of those who fought in the armed forces of the Confederate States of America during the Civil War, (*id*. ¶ 2). Adams is a member and vice president of SCV and the chairman of SCV's "Confederate Heritage Plate Program." (*Id*. ¶¶ 4, 6). Pursuant to the statutory scheme set forth in section 320.08053, SCV filed the requisite application materials with the Department for the establishment of a "Confederate Heritage" specialty license plate. (*Id*. ¶ 11). Defendants do not argue that SCV has failed to comply with the statutory requirements for submission of the "Confederate Heritage" plate.

On February 26, 2008, State Representative Donald Brown introduced House Bill 1159 to amend sections 320.08056 and 320.08058 to establish the proposed "Confederate Heritage" license plate. (*Id*. ¶ 13). The Department subsequently notified the staff directors of the House Infrastructure Committee and the Senate Transportation Committee that SCV had satisfied the statutory application requirements set forth in section 320.08053 for the creation of the proposed "Confederate Heritage" license plate. (*Id*. ¶ 12). However, no action was taken on House Bill 1159 in the 2008 legislative session, and the Legislature has taken no further action regarding House Bill 1159 to date. (*Id*. ¶ 14). As a result, the proposed "Confederate Heritage" license plate has not been established.[5]

---

[5]On June 17, 2008, the Legislature enacted a moratorium on the issuance of new specialty license plates, effective October 1, 2008. Ch. 2008-176, § 45, Laws of Fla. The moratorium does not apply to proposals submitted to the Department prior to May 2, 2008 or included in a bill filed during the 2008 Legislative Session, *id*., and therefore does not apply to SCV's application for the

**Analysis**

Plaintiffs challenge the constitutionality of Florida's specialty license plate program, arguing that it gives the Legislature "unfettered discretion" over the specialty license plate approval process in violation of the First Amendment, (Compl., Doc. 1, ¶ 38), and that therefore either the violative portions should be severed or sections 320.08053, 320.08056, and 320.08058 should be declared "unconstitutional *in toto*,"[6] (*id.* ¶ 39). Defendant Electra Theodorides-Bustle ("Defendant"),[7] responds that Florida's specialty license plate program does not violate the First Amendment because "specialty plates are government speech under Florida's statutory scheme, and government speech is not subject to scrutiny under the Free Speech Clause of the United States Constitution." (Doc. 28 at 2). In the alternative, Defendant also moves for judgment on the grounds that: (1) this Court lacks subject matter jurisdiction under the Tax Injunction Act, 28 U.S.C. § 1341; (2) the present action is barred by the Eleventh Amendment to the United States Constitution; and (3) Plaintiffs fail to state

_____

establishment of a "Confederate Heritage" specialty plate.

[6] The Complaint lists section 320.08056 twice in paragraph 39 but does not list section 320.08058. Because a number of other paragraphs in the Complaint attack the validity of section 320.08058, I will consider the repetition of section 320.08056 to be a scrivener's error and construe paragraph 39 as attacking both sections 320.08056 and 320.08058. (*See, e.g.*, Compl. ¶¶ 8, 10, 28, 38).

[7] Plaintiffs initially named all of the following as Defendants: Jeffrey Atwater, President of the Florida Senate; Larry Cretul, Speaker of the Florida House of Representatives; Andy Gardiner, Chairman of the Senate Transportation Committee; Richard Glorioso, Chairman of the House Committee on Infrastructure (collectively, "the Legislator-Defendants"); and Electra Theodorides-Bustle, Executive Director of the Department, all of whom were sued solely in their official capacities. (Doc. 1). Legislator-Defendants and Defendant Theodorides-Bustle filed separate motions to dismiss. (Docs. 10, 11). While the Legislator-Defendants were found to enjoy absolute legislative immunity and all claims against them were dismissed, Theodorides-Bustle's Motion to Dismiss was denied. (Doc. 24 at 13). Subsequently, Theodorides-Bustle filed the present Dispositive Motion to Dismiss, Dispositive Motion for Judgment on the Pleadings, and Dispositive Motion for Summary Judgment. (Doc. 28).

a claim against the Defendant upon which relief may be granted.  (*Id*. at 1-2).  A hearing was held on

the motion on August 18, 2010, (Doc. 46), during which the parties agreed that a trial is not necessary

and that the dispositive issue in this case is whether the speech at issue is government speech or

private speech.

## I.  First Amendment

### A.  Distinguishing Government Speech from Private Speech

The constitutionality of Florida's specialty license plate program does indeed turn on whether

messages contained on the specialty license plates constitute private speech, to which First

Amendment protections apply, or government speech, which is "exempt from First Amendment

scrutiny."  *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005).  "A government entity has

the right to speak for itself.  It is entitled to say what it wishes and to select the views that it wants to

express."  *Pleasant Grove City, Utah v. Summum*, 129 S. Ct. 1125, 1131 (2009) (internal citations,

quotations, and alteration omitted).  The same is true when a government entity "receives assistance

from private sources for the purpose of delivering a government-controlled message."  *Id*. (citing

*Johanns*, 544 U.S. at 562 (where the government controls the message, "it is not precluded from

relying on the government-speech doctrine merely because it solicits assistance from

nongovernmental sources")).  Thus, where the government "engag[es] in [its] own expressive

conduct, . . . the Free Speech Clause has no application."  *Id.*

On the other hand, "government entities are strictly limited in their ability to regulate private

speech in . . . 'traditional public fora.'" *Id. at 1132* (quoting *Cornelius v. NAACP Legal Def. & Educ.

Fund, Inc.*, 473 U.S. 788, 800 (1985)).  "Reasonable time, place, and manner restrictions are allowed,

but any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction

must be narrowly tailored to serve a compelling government interest." *Id.* (internal citations omitted). Restrictions based on viewpoint are strictly prohibited. *Id.* In addition to traditional public fora, the Supreme Court has also recognized that a "government entity may create 'a designated public forum' if government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose." *Id.* (citing *Cornelius*, 473 U.S. at 802). Government speech restrictions in a designated public forum are "subject to the same strict scrutiny as restrictions in a traditional public forum." *Id.*

A third type of public forum recognized by the Supreme Court is the "limited public forum." *Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971, 2984 n.11 (2010) (citing *Summum*, 129 S. Ct. at 1132). Government entities establish a limited public forum by opening government property for public speech but limiting the use of the government property to certain groups or dedicating it "solely to the discussion of certain subjects." *Summum*, 129 S. Ct. at 1132 (citing *Perry Educ. Ass'n*, 460 U.S. at 46 n.7). Speech restrictions imposed by the government in limited public fora, while not subject to strict scrutiny, must be reasonable and viewpoint-neutral. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001).

The Supreme Court has yet to set forth a specific framework for differentiating government speech from private speech, leaving some question as to the appropriate standard to apply in analyzing Florida's specialty license plate program. However, its analyses in *Johanns* and *Summum,* along with several circuit court cases discussing government speech versus private speech in the context of specialty license plate programs, provide some guidance.

In 2005, the Supreme Court addressed the distinction between government and private speech in determining whether a federal program requiring beef producers to finance promotional messages

to support the beef industry violates the First Amendment. *Johanns*, 544 U.S. at 554. The *Johanns* Court held that where "the government sets the overall message to be communicated and approves every word that is disseminated, it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages."[8]  *Id*. at 562.  In reviewing the legislation creating the beef promotion program, the Supreme Court noted that "Congress and the Secretary [of Agriculture] . . . set out the overarching message and some of its elements."  *Id*. at 561.  While Congress "left the development of the remaining details to an entity whose members are answerable to the Secretary, . . . the Secretary exercise[d] final approval authority over every word used in every promotional campaign."  *Id*.  Under this legislative scheme, "[t]he message set out in the beef promotions [was] from beginning to end the message established by the Federal Government" and therefore government speech.  *Id*. at 560.

More recently, the Supreme Court distinguished government speech from private speech in the context of city park monuments.  *Summum*, 129 S. Ct. at 1132.  In *Summum*, the respondents challenged the city's refusal to place a permanent monument donated by Summum, a religious organization, in a public park.[9]  *Id*. at 1130.  The 2.5-acre park already contained fifteen such permanent displays, at least eleven of which were donated by private groups or individuals.  *Id*.  The city rejected the respondents' monument because it did not comport with the city's policy of only

---

[8] The *Johanns* court did acknowledge that "[o]n some set of facts," the respondents may be able to establish an as-applied compelled speech challenge if it were established "that individual beef advertisements were attributed to respondents" rather than the government.  554 U.S. at 564-65.

[9] On two separate occasions, Summum's president wrote a letter to the city's mayor requesting permission to erect a stone monument that would contain "the Seven Aphorisms of SUMMUM" and be similar in size and nature to the Ten Commandments monument already displayed in the park. *Summum*, 129 S. Ct. at 1129-30.

accepting monuments that either "(1) directly relate[d] to the history of [the city], or (2) were donated by groups with longstanding ties to the . . . community." *Id.* at 1130. The *Summum* Court found that "[p]ermanent monuments displayed on public property typically represent government speech," and noted two particularly relevant characteristics of permanent monuments. *Id.* at 1132. First, the government is clearly identifiable as the speaker. Regardless of whether a monument is government-commissioned and financed or privately-financed and donated, it is apparent that it is the government speaking–rather than a private party–because "[g]overnments have long used monuments to speak to the public," and the monument is on government-owned property. *Id.* at 1133. Second, the government maintained extensive control over "the messages sent by the monuments." *Id.* Specifically, the government "exercised selectivity" and "editorial control" over the monuments and "[took] care in accepting donated monuments." *Id.* In light of these characteristics, city park monuments were found to communicate government speech.

Both before and after the Supreme Court's decisions in *Johanns* and *Summum*, several circuit courts have specifically addressed the issue of distinguishing government speech from private speech in the context of specialty license plates and developed three general approaches to doing so. Prior to the *Johanns* and *Summum* decisions, the Fourth Circuit decided *Sons of Confederate Veterans, Inc. v. Commissioner of the Virginia Department of Motor Vehicles*, 288 F.3d 610 (4th Cir. 2002), where it laid out the first of these approaches: the SCV factors. The SCV factors are a nonexhaustive list of factors used to determine the nature of the messages communicated on specialty plates and include:

> (1) the central "purpose" of the program in which the speech in question occurs; (2) the degree of "editorial control" exercised by the government or private entities over the content of the speech; (3) the identity of the "literal speaker"; and (4) whether the government or the private entity bears the "ultimate responsibility" for the content of the speech . . . .

*Id*. at 618-19 (citing *Wells v. City & Cnty. of Denver*, 257 F.3d 1132, 1141 (10th Cir. 2001)).  The SCV factors were subsequently adopted by the Ninth Circuit in *Arizona Life Coalition Inc. v. Stanton*, 515 F.3d 956, 965 (9th Cir. 2008), which was decided after *Johanns* but prior to *Summum*.

    The Seventh Circuit has found the SCV factors instructive but has opted to "simplif[y]" the inquiry.  *Choose Life of Ill., Inc. v. White*, 547 F.3d 853, 863 (7th Cir. 2008).  In *White*, which was also decided after *Johanns* but prior to *Summum*, the Seventh Circuit adopted the "reasonable person" standard, which "focus[es] on the following inquiry: [u]nder all the circumstances, would a reasonable person consider the speaker to be the government or a private party?"[10]  *Id*. at 863.   The Eighth Circuit also adopted the "reasonable person" standard in *Roach v. Stouffer*, 560 F.3d 860 (8th Cir. 2009), stating that the government speech analysis involves "one key question: whether, under all the circumstances, a reasonable and fully informed observer would consider the speaker to be the government or a private party."  *Id*. at 867.  Although *Roach* was decided approximately one month after *Summum*, the *Roach* court merely mentioned *Summum* in a footnote, stating that the *Summum* decision did not require a different outcome because "[u]nlike monuments displayed in public parks, specialty license plates that advertise the name or motto of a private organization facilitate expressive conduct on the part of the organization and its supporters, not the government."  *Roach*, 560 F.3d at 868 n.3.  The *Roach* court provided no further analysis of the *Summum* decision.

    Finally, the Sixth Circuit has provided the third approach to distinguishing government speech

_____

[10] A similar inquiry was later adopted by Justice Souter in his concurrence to *Summum*, where he opined that "the best approach that occurs to me is to ask whether a reasonable and fully informed observer would understand the expression to be government speech, as distinct from private speech the government chooses to oblige."  *Summum*, 129 S. Ct. at 1142 (Souter, J., concurring).

from private speech: the control approach.  In *American Civil Liberties Union of Tennessee v. Bredesen*, 441 F.3d 370 (6th Cir. 2006), which was decided after *Johanns* but before *Summum*, the Sixth Circuit found that the Supreme Court's decision in *Johanns* dictated that the linchpin of the government speech inquiry was the degree of control the government had over the speech.  *Id*. at 375 ("[W]hen the government determines an overarching message and retains power to approve every word disseminated at its behest, the message must be attributed to the government for First Amendment purposes.").

Informed by the Supreme Court's efforts to define the contours of the government speech doctrine in *Johanns* and *Summum*, as well as the analysis of specialty license plates set forth in other circuits, I decline to wholly adopt any of the three approaches developed in the other circuits.  The SCV factors were developed prior to the Supreme Court's decision in *Summum*, and the *Summum* Court neither adopted the SCV factors in name nor addressed three of the four factors in distinguishing government and private speech.  *Summum*, 129 S. Ct. at 1132-34.  Furthermore, while the "reasonable person" standard was presented in Justice Souter's concurrence to *Summum,* it was not adopted by the *Summum* majority and therefore will not be adopted here.  *Id.* at 1141-42. Additionally, while I agree with the Sixth Circuit that the degree of government control is a consideration in distinguishing private speech from government speech, the Supreme Court in *Summum* made clear that it is not the sole factor.  Instead, I conclude that the two considerations discussed in *Summum* provide the appropriate framework for distinguishing government speech from private speech in the context of Florida's specialty license plate program. These considerations are: (1) how easily the government is identified as the speaker, and (2) how much control the government has over the message communicated.  *Id*.  The more easily the government is identified as the speaker

-11-

and the greater the government's control over the message communicated, the more likely the message is to be government speech.  *Id.*

The first consideration–the ease with which the government could be identified as the speaker–indicates that specialty license plates are private, rather than government, speech.  When the *Summum* Court addressed this consideration, it noted that when permanent monuments are displayed on public property, there is "little chance that observers will fail to appreciate the identity of the speaker" as the government.[11]  *Id.* at 1133.  In contrast, when specialty license plates are placed on private vehicles, there is little chance that observers *will* appreciate the identity of the speaker as the government.

"The most obvious speakers in the specialty-plate context are the individual vehicle owners who choose to display the specialty plates and the sponsoring organizations whose logos or messages are depicted on the plates."  *White*, 547 F.3d at 863-64.  Unlike permanent monuments, which "governments have long used to speak to the public," *Summum*, 129 S. Ct. at 1132, specialty "plates serve as 'mobile billboards' for the [sponsoring] organizations and like-minded vehicle owners to promote their causes," *White*, 547 F.3d at 863.  With more than 110 specialty plates available to Florida vehicle owners, it is unlikely that the State of Florida would be identified as the speaker communicating each of the messages contained in the specialty plates.  *See Roach*, 560 F.3d at 868 ("[T]he wide variety of available specialty plates further suggests that the messages on specialty plates communicate private speech.").  Additionally, because specialty license plates are voluntary rather

_____

[11] In his concurrence, Justice Stevens noted that it was a "*near certainty* that observers will associate permanent displays with the governmental property owner."  *Summum*, 129 S. Ct. at 1139 (Stevens, J. concurring) (emphasis added).

than compulsory, private individuals–rather than the government–choose which message, if any, they want to communicate.  Under these circumstances, observers will not appreciate the identity of the speaker to be the State of Florida.  *See Bredesen*, 441 F.3d at 370 (Boyce, J., concurring in part and dissenting in part) (finding it illogical that the Tennessee government would decide to establish a specialty license plate promoting the University of Florida–the University of Tennessee's arch-rival in football–and stating that "it is a nice academic exercise to hypothesize that the license plate program is a governmental program to disseminate through private volunteers all of the state's various messages, but it seems to me to be a conclusion that only judges banished to our ivory towers and shut off from the real world could reach").

The second consideration–the degree of government control over the message communicated–also indicates that Florida's specialty license plate program provides a venue for private speech, not government speech.  Although the Department maintains final approval authority over the license plate, the substance of the message communicated originates with and is developed by the sponsoring organization.  *Compare Johanns*, 544 U.S. at 561 (noting that the Secretary's role in the beef campaign extended beyond granting final approval or rejection; government officials "also attend[ed] and participat[ed] in the open meetings at which proposals [we]re developed"), *with Sons of Confederate Veterans*, 288 F.3d at 621 (noting that Virginia's license plate design criteria "do[] not contain guidelines regarding the substantive content of the plates or any indication of reasons, other than failure to comply with size and space restrictions, that a special plate design might be rejected").

Under Florida's statutory scheme, the sponsoring organization submits a description of the proposed license plate, a proposed art design, and a sample plate in "substantially final form" to the Department. § 320.08053(1)(a), (2), Fla. Stat.  Furthermore, although the Department is "responsible"

-13-

for the development of the specialty license plates, *id.* § 320.08056(1), and there are some general guidelines regarding the design of certain specialty license plates, *see, e.g.*, *id.* § 320.08058(3)(a) ("Collegiate license plates must bear the colors and design approved by the department as appropriate for each state and independent university."), the relevant statutes do not contain any guidelines or criteria relating to the substantive content of specialty plates established under section 320.08053. Therefore, the substance of the messages communicated through specialty license plates created under section 320.08053 originates with the sponsoring organization, not the Legislature. *Cf. Planned Parenthood of S.C. v. Rose*, 361 F.3d 786, 793 (4th Cir. 2004) (finding that South Carolina's "Choose Life" license plate communicated government speech where the plate "originated with the State, and the legislature determined that the plate will bear the message 'Choose Life'"). Accordingly, the sponsoring organization–rather than the State of Florida–maintains control over the message communicated by specialty license plates.

As the previous discussion demonstrates, specialty license plates established under section 320.08053 implicate private speech rights.[12]   Therefore, the statutory scheme creating Florida's specialty license plate program must be analyzed[13] to determine if it allows the State to engage in

---

[12] Based on this finding, SCV's claim that the Florida specialty plate program violates its equal protection rights under the Fourteenth Amendment need not be addressed.

[13] The Supreme Court has expressed disfavor for facial challenges because they "often rest on speculation" and "raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008) (citing *Sabri v. United States*, 541 U.S. 600, 609 (2004)).  Facial challenges may "also run contrary to the fundamental principle of judicial restraint" and may "short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution."  *Id.*  Nonetheless, a facial challenge on overbreadth grounds is permissible where there exists "a realistic danger that the statute itself will significantly compromise recognized First Amendment rights of parties not before the Court."  *City Council of Los Angeles v. Taxpayers*

-14-

viewpoint discrimination.[14]  "The danger giving rise to [this] First Amendment inquiry is that the government is silencing or restraining a channel of speech . . . ." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988).  "This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official."  *Id.*  "[W]ithout standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker." *Id.* at 763-64.

The Florida specialty license plate program allows the Legislature to engage in exactly this type of dangerous viewpoint discrimination.  The statutory scheme provides instructions for submitting the license plate applications to the Legislature, § 320.08053(1)(d), Fla. Stat., and details the steps required if the application is approved, *id.* § 320.08053(2), but it omits any criteria to guide the Legislature in deciding whether to approve the application or not.  Consequently, the Legislature

_____

*for Vincent*, 466 U.S. 789, 801 (1984).  In the present case, the Florida specialty license plate program fails to provide *any* standards to channel the Legislature's discretion to amend the relevant statutes to establish specialty plates proposed under section 320.08053.  Such unbridled discretion creates a realistic danger that the statute would significantly compromise the First Amendment rights of any number of parties not currently before the Court.  While section 320.08053 was amended effective September 1, 2010, the version of the statute at issue in the present case continues to apply to organizations exempt from the moratorium under Section 45, and the Defendant does not argue or present any evidence to suggest that Section 45 applies only to SCV.  Indeed, at oral argument, the parties agreed that a facial challenge was appropriate in the present action.  (Doc. 46).

[14] Normally, a forum analysis would be undertaken at this juncture to determine whether section 320.08053 creates a traditional public forum, a designated public forum, or a limited public forum. *See, e.g.*, *White*, 547 F.3d at 864-65.  However, because section 320.08053 fails to prevent viewpoint discrimination, as discussed below, the statute is unconstitutional in any public forum.  Accordingly, the type of public forum created by section 320.08053 need not be determined at this juncture. *See Roach*, 560 F.3d at 868 n.4 ("[B]ecause we find that the statute unconstitutionally failed to provide standards or guidlines to prevent viewpoint discrimination, we need not [conduct a forum analysis].").

retains unfettered discretion to decline or approve a request for a specialty license plate based solely

on the sponsoring organization's viewpoint, and therefore the provisions of section 320.08053

granting this unfettered discretion are unconstitutional.[15] *See Women's Emergency Network*, 323 F.3d

at 941.

**B. Severability of Section 320.08053**

Plaintiffs contend that the offending provisions of section 320.08053—the last sentence of

subsection 1 and subsection 2 in its entirety—should be severed from the remainder of section

320.08053 and that a mandatory injunction should be issued directing Defendant to authorize the

"Confederate Heritage" license plate without legislative approval.  As discussed below, however, the

provisions are not severable.

State law determines the severability of a state statute.  *Seay Outdoor Adver., Inc. v. City of*

*Mary Esther*, 397 F.3d 943, 949 (11th Cir. 2005) (citing *Plain Dealer Publ'g Co.*, 486 U.S. at 772).

Under Florida law, when a portion of a statute is declared unconstitutional, the remainder of the

statute will be permitted to stand, provided:

> (1) the unconstitutional provisions can be separated from the remaining valid
> provisions, (2) the legislative purpose expressed in the valid provision can be
> accomplished independently of those which are void, (3) the good and the bad features
> are not so inseparable in substance that it can be said that the Legislature would have
> passed the one without the other and, (4) an act complete in itself remains after the
> valid provisions are stricken.

*Lawnwood Med. Ctr., Inc. v. Seeger*, 990 So. 2d 503, 518 (Fla. 2008) (quoting *Cramp v. Bd. of Pub.*

---

[15] The provisions of section 320.08053 granting the Legislature unfettered discretion to decline
to approve a proposed specialty license plate include the last line of subsection 320.08053(1) and
subsection 320.08053(2) in its entirety.

*Instruction*, 137 So. 2d 828, 820 (Fla. 1962)).  Plaintiffs maintain that the proposed severance is appropriate because it would remove the unconstitutional provisions of 320.08053 and leave in place an administrative route through which the Department would be required to approve any specialty license plate applications properly submitted by sponsoring organizations.  I disagree.

Section 320.08053 requires a sponsoring organization to submit an application to the Department, and after the Department ensures that the application is complete, it submits the application to the Legislature.  The Department has no authority under section 320.08053 to do anything else with the application until it is approved by the Legislature.  Therefore, if section 320.08053 were to be severed in the manner proposed by Plaintiffs, the result would not be to simply remove the Legislature's discretion and make the approval of specialty license plates purely administrative; rather, severance in that manner would remove the mechanism for approving new specialty license plate applications filed under section 320.08053 altogether.

No other section of the Florida Statutes provides a mechanism for approving specialty license plate applications.  Section 320.08056 states that "[t]he department is responsible for developing the specialty license plates **authorized in s. 320.08053**," § 320.08056(1), Fla. Stat. (emphasis added).  It then explains the process of issuing those license plates to the individual owners or lessees of motor vehicles including the fees and taxes required for each plate.  *Id.* § 320.08056(2)-(5), (7), (10)-(11).  Section 320.08056 also addresses the design, renewal, and discontinuance of specialty license plates that have been approved pursuant to section 320.08053.  *Id.* § 320.08056(6), (8)-(9), (12).  Nowhere, however, does section 320.08056 provide an independent process for approving specialty license plates. In other words, section 320.08056 only provides a framework for the Department to follow when issuing and regulating those specialty license plates that have already been approved by the

Legislature under section 320.08053.  Similarly, section 320.08058 merely lists the specialty license plates that have been approved by the Legislature pursuant to the process set out in section 320.08053 and authorizes the Department to issue them; it does not provide its own approval process.

The remaining provisions of section 320.08053, even when combined with sections 320.08056 and 320.08058, fail to create "an act complete in itself."[16] *Cramp*, 137 So. 2d at 830.  In addition, the legislative purpose expressed in the remaining provisions of § 320.08053—establishing specialty license plates through an application process—could not be accomplished independent of the void provisions.  *See Lawnwood*, 990 So. 2d at 518 (finding the statute at issue could not be severed where the statute would not be "an act complete in itself, once the invalid portions are severed, that would accomplish what the legislature so clearly intended").  Accordingly, under Florida law, the unconstitutional provisions of section 320.08053 cannot be severed from the remainder of the section, rendering section 320.08053 void in its entirety.

Plaintiffs contend that if the unconstitutional provisions of section 320.08053 cannot be severed, then the entire specialty license plate scheme–sections 320.08053, 320.08056, and 320.08058–should be declared "unconstitutional *in toto*."  (Doc. 38 at 14).  Plaintiffs maintain that "[t]o do otherwise means leaving in place a system which inhibits free speech rights by conditioning that speech on obtaining a license or permit from a government official in that official's boundless

---

[16] Plaintiffs cite *Roach v. Stouffer* in support of their contention that section 320.08053 is severable.  In *Roach*, the Eighth Circuit found the unconstitutional provisions to be severable from the remainder of the specialty license plate statutory scheme where the remaining provisions provided "sufficient statutory authority [] for the Department of Revenue to issue specialty license plates after receiving the approval of the Joint Committee."  560 F.3d at 871.  Here, the remaining provisions of section 320.08053 would not similarly provide a mechanism for issuing specialty license plate applications filed under section 320.08053.

discretion." (*Id*.).

Notwithstanding Plaintiffs' characterization of the Florida specialty license plate program as a "system" encompassing sections 320.08053, 320.08056, and 320.08058, Plaintiffs fail to allege that either section 320.08056 or section 320.08058 grants the Legislature unfettered discretion to approve or deny applications for specialty license plates.  In fact, as noted above, neither section 320.08056 nor section 320.08058 discusses any approval process of specialty license plates except for referencing the one set forth in section 320.08053.  A finding that section 320.08053 is void in its entirety, therefore, does not necessitate a finding that sections 320.08056 and 320.08058 are also unconstitutional.  Moreover, it is unclear that Plaintiffs would have standing to challenge the constitutionality of sections 320.08056 and 320.08058, as they have not alleged any specific harm, either actual or imminent, arising from these particular statutory provisions. *See Women's Emergency Network*, 323 F.3d at 947 (finding the appellants lacked standing to challenge Florida's "Choose Life" specialty plate statute, section 320.08058(30), because the "Choose Life statute does not in any way restrict or prohibit Appellants' speech.  Nothing in the Choose Life statute prevents Appellants from applying for or gaining entrance to the specialty license plates forum.  The First Amendment protects the right to speak; it does *not* give Appellants the right to stop others with opposing viewpoints from speaking.") (emphasis in original).

## II.  Motion to Dismiss for Failure to State a Claim and Eleventh Amendment Immunity

Although the Defendant agrees that disposition of this case turns on whether the messages communicated by specialty license plates are private speech or government speech, she has not waived other arguments previously raised.  Specifically, Defendant contends that even if the specialty license plate statute is unconstitutional, the Complaint fails to allege that Defendant did anything, or

failed to do anything, that violated the Plaintiffs' rights under the First Amendment or any other provision of law and therefore, the complaint should be dismissed because the Plaintiffs can prove no set of facts that would entitle them to relief.  (Doc. 28 at 10)  Additionally, Defendant argues that this is a suit against the state of Florida and therefore it should be dismissed because it is barred by the Eleventh Amendment.  (*Id.* at 8-10).  Defendant's arguments are unpersuasive.[17]

The Eleventh Amendment bars suits against a state by citizens of another state as well as suits initiated by that state's own citizens.[18]  *Edelman v. Jordan*, 415 U.S. 651, 663 (1974).  Thus, "[u]nless a State has waived its Eleventh Amendment immunity or Congress has overridden it, [] a State cannot be sued directly in its own name regardless of the relief sought."  *Graham*, 473 U.S. at 167 n.14 (internal citations omitted).  However, there is a well-recognized exception to this rule for suits against state officers seeking prospective equitable relief to end continuing violations of federal law. *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999) (citing *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 269 (1997)).  Because "an unconstitutional statute is void, and therefore does not 'impart to [the officer] any immunity from responsibility to the supreme authority of the

---

[17] Defendant also argues that this Court lacks subject matter jurisdiction over the present action under the Tax Injunction Act, 28 U.S.C. § 1531, because "[d]eclaring sections 320.08056 and 320.08058 to be unconstitutional will prohibit the State of Florida from collecting the fees set forth in section 320.08056." (Doc. 28 at 2-3).  Defendant further maintains that the Eleventh Amendment bars the present action because a declaration that section 320.08056 is invalid would result in a monetary loss resulting from a past breach of a legal duty.  (Doc. 28 at 8-9).  Because I do not find sections 320.08056 and 320.08058 to be invalid, these contentions need not be addressed, as conceded by the Defendant at oral argument.

[18] The Eleventh Amendment to the United States Constitution provides: "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.

United States,' the Supreme Court has held that the officer is not entitled to protection by the state's sovereign immunity." *Green v. Mansour*, 474 U.S. 64, 68 (1985) (quoting *Ex parte Young*, 209 U.S. 123, 160 (1908)).  This exception has been described as a "legal 'fiction' because it creates an imaginary distinction between the state and its officers, deeming the officers to act without the state's authority, and, hence, without immunity protection, when they enforce state laws in derogation of the Constitution."  *Summit Med.*, 180 F.3d at 1336 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 114 n.25 (1984)).

> In *Ex parte Young*, the Supreme Court observed:
>
> In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.
>
> . . . The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, and whether it arises out of the general law, or is specifically created by the act itself, is not material as long as it exists.

209 U.S. at 157.  "Therefore, unless the state officer has some responsibility to enforce the statute or provision at issue, the 'fiction' of *Ex parte Young* cannot operate," and a suit against a state officer seeking to challenge the constitutionality of the statue or provision is barred by the Eleventh Amendment.  *Summit Med.*, 180 F.3d at 1341.  On the other hand, where a state officer has some responsibility to enforce the statute or provision at issue, that state officer is a proper defendant in an action seeking to challenge the constitutionality of the statute or provision under the "fiction" of *Ex parte Young*.  *Id*.

> In the present case, section 320.08056(1) provides that "[t]he [D]epartment is responsible for developing the specialty license plates authorized in s. 320.08053."  The Defendant, as Executive

Director of the Department, exercises a sufficient connection to the enforcement of the challenged statute, as required by *Ex parte Young*, to be a proper defendant to the present action, which seeks prospective equitable relief to end alleged continuing violations of federal law. *See Roach v. Stouffer*, 560 F.3d 860, 871 (8th Cir. 2009) (upholding a permanent injunction ordering the Director of the Missouri Department of Revenue to issue a "Choose Life" specialty plate where the relevant statutes charged the Department of Revenue with issuing specialty license plates). Accordingly, the Complaint states a claim against the Defendant upon which relief may be granted, and this suit does not violate the Eleventh Amendment.

### Conclusion

By placing unfettered discretion in the hands of government officials to grant or deny access to a public forum, section 320.08053, Florida Statutes, "creates a threat of censorship that by its very existence chills free speech." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 964 n.12 (1984). This threat of censorship is heightened when the speech at issue is controversial, as it is in this case. Indeed, the fact that the speech is controversial strikes at the very heart of First Amendment protections, for "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Accordingly, because section 320.08053 (2009) implicates private speech rights and provides the Legislature with unfettered discretion to engage in viewpoint discrimination when declining to approve a specialty license plate application, it is unconstitutional under the overbreadth doctrine. Additionally, because the remaining portions of section 320.08053 do not provide a mechanism for approving applications for specialty license plates, section 320.08053 is void in its entirety. Thus, no

rights can be granted to the Plaintiffs under this section, and the Defendant will not be directed to issue the proposed "Confederate Heritage" license plate.  Sections 320.08056 and 320.08058 do not similarly provide the Legislature with unfettered discretion to restrain speech in violation of the First Amendment and therefore are not void as unconstitutional.  It is **ORDERED** that Defendant Electra Theodorides-Bustle's Dispositive Motion to Dismiss, Dispositive Motion for Judgment on the Pleadings, and Dispositive Motion for Summary Judgment (Doc. 28) is **DENIED.**  The Clerk is directed to enter judgment in favor of Plaintiffs declaring section 320.08053, Florida Statutes (2009), unconstitutional[19] and thereafter close this file.

     **DONE** and **ORDERED** in Orlando, Florida on March 30 , 2011.

JOHN ANTOON II
United States District Judge

Copies furnished to Counsel of Record

---

[19]Although Plaintiffs did not file a cross-motion for summary judgment, all parties filed trial briefs (Docs. 38 and 40) and agreed in the Joint Advisement to the Court (Doc. 43) and subsequently at the August 18, 2010 hearing that no trial was necessary and that this case could be resolved on the parties' filings.

-23-